UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LE SOLEIL CHILD CARE LLC, an Idaho limited liability company; JESSICA DUVALL, an individual; LESLIE SEDLACEK, an individual; SAMANTHA TODD, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>RAÚL R. LABRADOR, in his official capacity as the Attorney General for the State of Idaho; JAN BENNETTS, in her official capacity as Prosecuting Attorney for Ada County,<br><br>Defendants. | Case No. 1:25-cv-00695-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) and Defendant Attorney General Raúl R. Labrador's Motion to Dismiss (Dkt. 16). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motion on the record. Dist. Idaho Loc. Civ. R. 7.1(e)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the following reasons, the Court grants the motion to dismiss and denies the motion for preliminary injunction as moot.

## I. BACKGROUND

In 2025, the Idaho Legislature passed the Idaho Medical Freedom Act (IMFA), which prohibits businesses from requiring medical interventions as a condition of receiving services,

employment, or access to certain facilities, and prohibits state and local governments from imposing similar requirements. Idaho Code § 73-503(1)–(7). As relevant here, the IMFA provides that "a school operating in the state or a business subject to chapter 11, title 39, Idaho Code, operating in the state shall not mandate a medical intervention for any person to attend, enter campus or buildings, or be employed, subject to the requirements of the Idaho parental rights act." *Id.* 73-503(4). Plaintiff Le Soleil Child Care LLC operates a daycare in Idaho and is a business subject to chapter 11, title 39 (Dkt. 1 ¶ 19). Plaintiffs Jessica Duvall, Leslie Sedlacek, and Samantha Todd (Parent Plaintiffs) are parents of children who attend or intend to attend Le Soleil (*id.* ¶¶ 2–4).

In response to the IMFA's passage, Plaintiffs filed this action on December 11, 2025, arguing that the IMFA is unconstitutional because it unlawfully infringes on the Parent Plaintiffs' fundamental rights to direct their children's care and to associate with like-minded families and childcare providers; unlawfully burdens Le Soleil's protected business interests; is unconstitutionally vague; and infringes on the Plaintiffs' right of association (*id.* ¶¶ 91–161; Dkt. 20 at 10). Plaintiffs assert eight causes of action. Count One alleges that the IMFA violates Le Soleil's right to due process under the Fourteenth Amendment (Dkt. 1 ¶¶ 91–99), while Count Two alleges a corresponding violation of the Idaho Constitution (*id.* ¶¶ 100–08). Count Three alleges that the IMFA is unconstitutionally vague under the Fourteenth Amendment (*id.* ¶¶ 109–14). Count Four alleges that the IMFA violates the Parent Plaintiffs' right to due process under the Fourteenth Amendment (*id.* ¶¶ 115–26), while Count Five alleges a corresponding violation of the Idaho Constitution (*id.* ¶¶ 127–36). Count Six alleges that the IMFA violates the Idaho Parental Rights Act, Idaho Code § 32-1010, *et seq.* (Dkt. 1 ¶¶ 137–47). Count Seven alleges that the IMFA violates Plaintiffs' First Amendment right to expressive association (*id.* ¶¶ 148–61). Finally, Count

Eight seeks a declaratory judgment concerning Plaintiffs' obligations under the IMFA (*id.* ¶¶ 162–65). Plaintiffs bring their federal claims under 42 U.S.C. § 1983 and their state-law claims under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. That same day, Plaintiffs moved for injunctive relief requesting an order enjoining Defendants from enforcing the IMFA's restrictions on private daycares (Dkt. 2 at 2). Defendants include Idaho Attorney General Raúl Labrador (the AG) and Ada County's elected Prosecuting Attorney Jan Bennetts (Dkt. 1 ¶¶ 5–6).

On January 16, 2026, the AG moved to dismiss all of Plaintiffs' claims, arguing that the Parent Plaintiffs lack standing, the Plaintiffs' state-law claims are barred by the Eleventh Amendment, and that Plaintiffs' remaining claims fail to state a claim upon which relief can be granted (Dkt. 16).[1]

## II. LEGAL STANDARD

### A. Standing

At the preliminary injunction stage, plaintiffs "must make a clear showing of each element of standing," proving (1) an injury in fact, (2) traceability, and (3) redressability. *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013); *see also Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020). Pre-enforcement injury, however, "is a special subset of injury-in-fact" because "[f]or pre-enforcement plaintiffs, the injury is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). Accordingly, to establish pre-enforcement standing, plaintiffs must show that: (1) they intend "to engage in a course of conduct arguably affected with a constitutional interest"; (2) the intended future conduct is

[1] The AG argues that Plaintiffs' state-law claims are barred by the Eleventh Amendment (Dkt. 16-1 at 8). Plaintiffs concede the point, agreeing that Counts Two, Five, and Six, as well as the state-law component of Count Eight, must be dismissed on sovereign-immunity grounds (Dkt. 20 at 13–14). Accordingly, the Court dismisses those claims.

arguably proscribed by the challenged statute; and (3) the threat of future enforcement is substantial. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). The burden of establishing standing is on the party invoking federal jurisdiction. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

A plaintiff's ability to demonstrate a likelihood of success on the merits is the most important factor in determining whether a preliminary injunction should issue. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). "[O]nce the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Id.*

**B. Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading that merely pleads "labels and conclusions" or a "formulaic recitation" of the elements of a cause of action, or "naked assertions" devoid of "further factual enhancement" will not suffice. *Id.* Determining whether a complaint states a plausible claim for relief is a context-specific task requiring the court to draw on its judicial experience and common sense. *Id.*

Under Rule 12(b)(6), the court must accept the plaintiff's factual allegations as true and grant all reasonable inferences in the plaintiff's favor. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. To survive a Rule 12(b)(6) motion to dismiss, the non-conclusory factual allegations, and reasonable inferences

from those allegations, must state a claim for relief that is plausible on its face. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether it "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citation modified).

## III. ANALYSIS

The Attorney General moves to dismiss the Parent Plaintiffs' claims for lack of standing and moves to dismiss Plaintiffs' remaining claims under Rule 12(b)(6), arguing that they fail to state a legally cognizable claim (Dkt. 16). Plaintiffs oppose dismissal, maintaining that the IMFA violates their constitutional rights and the Idaho Parental Rights Act (Dkt. 20).

### A. Parent Plaintiffs' Standing

The AG argues that Parent Plaintiffs' claims (Counts Four, Five, and Six) must be dismissed because they fail to allege an injury-in-fact (Dkt. 16-1 at 7). As the party invoking federal jurisdiction, Parent Plaintiffs bear the burden of establishing standing.

To establish injury in fact, Parent Plaintiffs must demonstrate that they have suffered, or will suffer, an injury that is "concrete and particularized" and "actual or imminent." *Townley*, 722 F.3d at 1133. By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a

particular government action. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury-in-fact prong is satisfied in the pre-enforcement context if Parent Plaintiffs demonstrate: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) the conduct is "proscribed by a statute"; and (3) "there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159. The AG asserts that Parent Plaintiffs cannot satisfy the second prong because they "fail[ed] to plead that they intend to 'engage in a course of conduct arguably affected with a constitutional interest' that is 'arguably proscribed by the statute'" (Dkt. 23 at 3 (quoting *Driehaus*, 573 U.S. at 161–64); Dkt. 16-1 at 6). Parent Plaintiffs respond that they have alleged concrete injuries to their right to direct the care, custody, and upbringing of their children, and their right of expressive association (Dkt. 20 at 11).

The second *Driehaus* prong examines whether the plaintiff's intended conduct—not merely conduct affecting the plaintiff—is arguably proscribed by the challenged law. *Kumar v. Koester*, 131 F.4th 746, 753–54 (9th Cir. 2025). Thus, it is not enough that a plaintiff has a constitutional interest that is affected by a challenged law; the plaintiff must also identify conduct that the law arguably prohibits. *Id.* at 754. In *Kumar*, two Hindu professors challenged a university's use of the word "caste" to define race or ethnicity as a protected class. *Id.* at 749–50. The Ninth Circuit explained that while the professors had a constitutional interest in practicing their religion, they failed the second prong because the challenged policy did not arguably proscribe any religious practice in which they intended to engage. *Id.* at 753–54. In concluding that the professors alleged no injury to their ability to exercise religion, the court noted that their claims were "the exact 'moral, ideological, or policy objection to a particular government action' that the injury in fact requirement is meant to 'screen[] out.'" *Id.* at 754 (quoting *All. for Hippocratic Med.*, 602 U.S. at 381).

By contrast, the Ninth Circuit in *Seattle Pacific v. Ferguson* found that the Christian university plaintiff challenging a law prohibiting employment discrimination based on sexual orientation satisfied the second prong because the statute directly regulated the university's employment practices. 104 F.4th 50, 60 (9th Cir. 2024). Because the university was itself the regulated entity and it alleged it intended to maintain an employment policy prohibiting same-sex relationships, the court held that it established a pre-enforcement injury-in-fact. *Id.* at 59–61.

Here, Parent Plaintiffs likely satisfy the first *Driehaus* prong because their decision about the environment in which they place their children arguably implicates their fundamental right to direct the care, custody, and upbringing of their children. But like the plaintiffs in *Kumar*, they fail to satisfy the second prong because they have not demonstrated that the IMFA arguably proscribes any conduct in which they intend to engage. The IMFA regulates daycares—not parents. Parent Plaintiffs have not alleged that they intend to operate a daycare or mandate medical interventions.

Parent Plaintiffs' expressive-association claim fares no better. Although their allegation that the IMFA forces Plaintiff Parents' minor children to "associate with unvaccinated children in their childcare environment" likely satisfies the first prong because expressive association is protected by the First Amendment (Dkt. 1 ¶ 158), they fail on the second prong because nothing in the IMFA compels Parent Plaintiffs to place their children in daycare or forbids them from doing so. As noted by the AG, "[p]arents may associate with each other when and how they choose; parents may place their children in a daycare or school of their choice—or choose not to use a daycare. The [IMFA] simply does not regulate these decisions" (Dkt. 16-1 at 7). Rather, their claims indicate only that they are offended by a policy that exposes their children to "families who do not share their values and beliefs regarding the importance of vaccination for young children" (Dkt. 20 at 12). Like *Kumar*, their objections amount to the exact "moral, ideological, or policy

objection to a particular government action" that the injury in fact requirement is meant to "screen out."

Because Parent Plaintiffs have not alleged that they intend to engage in conduct that the IMFA arguably proscribes, the Court concludes that they have not shown standing to bring a pre-enforcement action pursuant to the First Amendment or Due Process Clause.

**B. Counts One and Four: Substantive Due Process Claims**

Count One is a cause of action on behalf of Le Soleil against all Defendants alleging that the IMFA violates Le Soleil's Fourteenth Amendment due process rights because "[b]y forbidding daycares from excluding sick and contagious children, the IMFA impermissibly infringes on the rights of a private business to operate as it sees fit" (Dkt. 1 ¶¶ 91–99). In Count Four, Parent Plaintiffs allege that the IMFA violates their fundamental right to parent (*id.* ¶¶ 115–26). Specifically, they contend the IMFA interferes with their right to choose a daycare that aligns with their values by "requiring certain immunizations to attend and excluding sick children" (*id.* ¶ 120).

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994). Governmental action that infringes a fundamental right is constitutional only if "the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). "Where a fundamental right is not implicated . . . governmental action need only have a rational basis to be upheld against a substantive due process attack. If a statute is not arbitrary, but implements a rational means of achieving a legitimate governmental end, it satisfies

due process." *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997). Under rational basis review, the burden is on the challenger to show the government did not act legitimately. *Halverson v. Skagit County*, 42 F.3d 1257, 1262 (9th Cir. 1994).

**1. Le Soleil's Economic Rights**

The parties agree that rational basis applies to Le Soleil's due process claim (Dkt. 16-1 at 9; Dkt. 20 at 14); *see also Jackson Water Works, Inc. v. Pub. Util. Comm'n of Cal.*, 793 F.2d 1090, 1093–94 (9th Cir. 1986) (holding "[t]he proper test for judging the constitutionality of statutes regulating economic activity . . . is whether the legislation bears a rational relationship to a legitimate state interest"). Thus, the IMFA is presumed valid unless Le Soleil demonstrates that it is not rationally related to a legitimate government interest. *See Kim*, 121 F.3d at 1273-74. The Court finds that it does.

Courts may apply rational-basis review to statutory challenges at the motion-to-dismiss stage and hypothesize a legitimate governmental interest. *See Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 938 (9th Cir. 2000). A statute is constitutional if (1) it has a "legitimate governmental purpose" and (2) there is a "rational relationship between" that purpose and the means chosen by the government to achieve that purpose. *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." *Dittman v. California*, 191 F.3d 1020, 1031 (9th Cir. 1999) (quoting *Halverson*, 42 F.3d at 1262) (citation modified).

The AG maintains that the Legislature passed the IMFA for the purpose of "reducing barriers to childcare by ensuring that all seats are open to all parents" (Dkt. 23 at 4). Prohibiting vaccine mandates as a condition of attendance is a rational means of achieving this objective because it affords parents greater access to the daycare of their choice without regard to the medical

decisions they have made for their child. Le Soleil, however, argues that eliminating barriers to childcare is not a legitimate interest because the AG characterizes childcare as a voluntary commercial transaction (Dkt. 20 at 15). According to Le Soleil, the AG failed to identify any actual barriers faced by parents who prefer not to vaccinate their children (*id.*). But it is Le Soleil's burden to show that the State did not have a legitimate reason for acting as it did. *See Excel Fitness Fair Oaks, LLC v. Newsom*, No. 220CV02153, 2021 WL 795670, at *6 (E.D. Cal. Mar. 2, 2021) (explaining that it was "not [the state's] burden to prove they did have a legitimate reason," but the challenger's burden to prove that they did not). Le Soleil has not carried that burden.

Le Soleil further contends that the IMFA arbitrarily exempts public and private schools from its prohibitions and that "there is no rational basis for treating daycares, which serve younger, more vulnerable children, differently from schools in this regard" (Dkt. 20 at 15). But, as the AG correctly notes, the IMFA does not prohibit excluding a child with a contagious illness "because [he] . . . has not received or used a medical intervention" (Dkt. 16-1 at 10–11 (quoting I.C. § 73-503(1)). Because the IMFA does not treat daycares and schools differently in the manner Le Soleil alleges, its disparate treatment argument is without merit.

Therefore, the Court finds that the IMFA is rationally related to the Legislature's purpose, and Le Soleil's due process claim fails as a matter of law.

**2. Parent Plaintiffs' Fundamental Right to Parent**

Because the Court concludes that Parent Plaintiffs lack Article III standing on their due process claim, the Court need not address whether it survives a Rule 12(b)(6) analysis. Nonetheless, the Court addresses it.

Parent Plaintiffs argue that the IMFA infringes their fundamental right to parent because it interferes with their ability to choose a daycare consistent with their child-rearing decisions (Dkt. 1 ¶¶ 115–26). They further contend that the "right to select the childcare forum, including a private

daycare, that will physically care for their children in a manner consistent with the parents' decisions regarding health, education, and socialization" is encompassed within their fundamental right to direct the care, custody, and control of their children (Dkt. 20 at 20) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). According to Parent Plaintiffs, because the IMFA infringes upon a fundamental right, it is subject to strict scrutiny.

The AG responds that the IMFA does not implicate parental rights because it regulates daycares, not parents (Dkt. 16-1 at 14–15). The AG further argues that, even if the IMFA affects Parent Plaintiffs' childcare choices, there is no substantive due process right to commercial daycare (*id.* at 15–16). To determine whether Parent Plaintiffs have properly stated a claim, the Court must first determine whether they have adequately alleged a right recognized as fundamental. The Court then considers whether the IMFA actually infringes that right. If the IMFA restricts a fundamental right, the statute must withstand strict scrutiny. If the IMFA does not burden a fundamental right, rational-basis review applies.

**i. Fundamental Right**

The first question before the Court is whether the Parent Plaintiffs' asserted rights fall within the broader, well-established right to direct the upbringing of one's child. Here, Parent Plaintiffs broadly assert that the fundamental right of parents to make decisions concerning the care, custody, and control of their children includes the right to ensure their children are in a childcare environment that takes steps to prevent disease outbreaks and to keep children safe and healthy; to direct their children's upbringing and education; to protect their children's health; and to answer their high duty to seek and follow medical advice on their children's behalf (Dkt. 1 ¶¶ 117, 121–22). The Supreme Court has held that the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause. *See Troxel*, 530 U.S. at 66. This right is commonly referred

to as the *Meyer–Pierce* right because it finds its origin in two Supreme Court cases, *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). "But this broad parental right is not absolute; it must 'bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*.'" *Regino v. Staley*, 133 F.4th 951, 961 (9th Cir. 2025) (quoting *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012)). "Because limitations on this general right circumscribe its scope and delineate its contours, 'identifying a general parental right is far different than concluding that it has been infringed.'" *Id.* (quoting *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1042 (9th Cir. 2000)). Additionally, the Supreme Court has cautioned that courts must be "reluctant to expand the concept of substantive due process," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), to avoid usurping "authority that the Constitution entrusts to the people's elected representatives," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239–40 (2022).

Here, Parent Plaintiffs invoke the fundamental right of parents to make decisions concerning the care, custody, and control of their children. But identifying a generally recognized parental right does not resolve whether the particular choice at issue here falls within that right. The Supreme Court has repeatedly rejected broad formulations of asserted fundamental rights, in favor of being "more precise." *Glucksberg*, 521 U.S. at 723. For example, rather than examining a generic "right to die," the Supreme Court identified the "constitutionally protected right to refuse lifesaving hydration and nutrition." *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277–79 (1990). Courts must "eschew sweeping generalizations" and instead "adopt a narrow definition of the interest at stake." *Regino*, 133 F.4th at 964 (quoting *Raich v. Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007)). Accordingly, the Court rejects Parent Plaintiffs' broad characterization of the right to parent and instead precisely defines the asserted right before determining whether it

is protected by substantive due process. *See Pickup v. Brown*, 740 F.3d 1208, 1235 (9th Cir. 2014), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018).

An examination of the complaint and briefing reveals that the particular parental decision at issue here is Parent Plaintiffs' choice of a third-party childcare provider. Parent Plaintiffs contend that their fundamental right to direct the care, custody, control, and nurture of their children includes the right to select a private daycare that will care for their children in a manner consistent with the parents' decisions concerning their children's health, education, and socialization (Dkt. 20 at 20–22). The question, therefore, is whether the fundamental right to direct the care, custody, and control of one's children encompasses a right to select a third-party childcare provider based on whether that provider's practices conform to the parents' decisions concerning their children's care.

In *Pickup*, the Ninth Circuit reiterated that "parents have a constitutionally protected right to make decisions regarding the care, custody, and control of their children, but that right is 'not without limitations.'" 740 F.3d at 1235. There, plaintiffs asserted that their fundamental parental rights included the right to obtain a particular type of mental-health treatment for their children. *Id.* at 1235–36. The Ninth Circuit recognized the general parental right to make decisions concerning the care, custody, and control of children, but concluded that the asserted right to choose a particular provider for a particular treatment was not encompassed within that fundamental right. *Id.*

The Ninth Circuit's decision in *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), likewise demonstrates that the fundamental right to parent has limits. There, parents challenged a public school's administration of a survey containing questions about sex. *Id.* at 1203. The court rejected the argument that the survey violated their parental rights, holding that although

parents have a right to inform their children about sex as they choose, that right did not include the "right to compel public schools to follow their own idiosyncratic views as to what information the schools may dispense." *Id.* at 1205–06. Citing *Fields*, the *Pickup* court explained that recognizing the right to choose for their children a particular type of provider for medical or mental health treatment that the state has deemed harmful "would be to compel the [state] legislature, in shaping its regulation of mental health providers, to accept [p]laintiffs' personal views of what therapy is safe and effective for minors." *Pickup*, 740 F.3d at 1236.

Here, Plaintiffs' asserted right is to select a childcare environment that takes steps to prevent disease outbreaks and to keep children safe and healthy (Dkt. 1 ¶ 121). Like *Fields*, this right concerns Parent Plaintiffs' ability to choose a third-party childcare provider based on the provider's approach to their children's health and care. As explained in *Pickup*, recognizing such a right would compel the Idaho Legislature, in shaping its regulation of daycares, to accept Parent Plaintiffs' personal views on vaccinations. The Court declines to expand the concept of substantive due process to include the right to choose a childcare environment based on a parent's health preferences. *See Glucksberg*, 521 U.S. at 720. The asserted right therefore is not encompassed within the fundamental right to parent.

To be sure, there is undoubtedly a "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. But that right is not unlimited. *See Regino*, 133 F.4th at 961 (recognizing that the parental right must "bow to other countervailing interests and rights"); *Parham v. J.R.*, 442 U.S. 584, 603 (1979) ("[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (upholding compulsory vaccination for children); *Pickup*, 740 F.3d at 1236 (noting that parents

cannot compel a state to accept their views "of what therapy is safe and effective for minors"). Here, Parent Plaintiffs do not allege that the IMFA prevents them from directing how their children are raised or educated, or from making decisions concerning *their* children's health. Rather, they assert a right to select a third-party daycare that will exercise its own caregiving practices in a manner consistent with those decisions. As *Fields* and *Pickup* demonstrate, the fundamental right to parent does not give parents a right to compel a third party to conform its practices to the parents' own "idiosyncratic views." Thus, although the general right to direct a child's upbringing and education is fundamental, the particular right Parent Plaintiffs assert here is not.

**ii. Restriction on a Fundamental Right**

Even if Parent Plaintiffs' asserted right was fundamental, the Court is not persuaded that the IMFA restricts it. The right to parent protects parents' decisions about how their children are raised, educated, and cared for. The IMFA, on the other hand, regulates what a daycare may require of children and parents as a condition of attendance. One does not necessarily offend the other. As the AG explains, the IMFA does not regulate Parent Plaintiffs' decisions concerning the care, custody, or upbringing of their children (Dkt. 16-1 at 14). Rather, it regulates the conduct of daycares, prohibiting them from mandating specified medical interventions as conditions of attendance or employment. I.C. § 73-503(4).[2]

Parent Plaintiffs counter that a law need not directly regulate parents to infringe on their right to parent, citing to *Meyer* and *Farrington v. Tokushige*, 273 U.S. 284 (1927), in support

---

[2] It is not clear what the interplay is between the IMFA's prohibitions and the immunization requirements for daycare licensing purposes under Idaho Code § 39-1118. Under that statute, commercial daycares must obtain a child's immunization record verifying that the child has received or is in the process of receiving age-appropriate immunizations within fourteen days of beginning attendance. *Id.* § 39-1118(1). The statute also provides for certain medical and religious exceptions. *Id.* § 39-1118(2). Notably, § 39-1118 was amended during the same legislative session as the IMFA. As neither party substantively addresses § 39-1118, the Court declines to do so here.

(Dkt. 20 at 17, 19). Both of those cases struck down regulations that infringed upon fundamental parental rights in the context of schools and education. *See Farrington*, 273 U.S. at 298–99; *Meyer*, 262 U.S. at 400. In *Meyer*, the Court explained that the right of parents to direct their children's education corresponded to the parent's "natural duty" to provide the child an education—a duty enforced by compulsory-education laws in nearly all states—and recognized that the education of young children is ordinarily accomplished through schools operated by qualified persons. 262 U.S. at 400. Thus, the regulations at issue in *Meyer* directly burdened how parents fulfilled their recognized responsibility to educate their children. Similarly, the Court in *Farrington* struck down a law prohibiting foreign language studies in schools, holding that parents have the right to direct their children's *education* without unreasonable restrictions. 273 U.S. at 298. Neither *Meyer* nor *Farrington*, however, recognized a broader parental right to control the practices of private commercial establishments that provide childcare. Those cases therefore do not support Parent Plaintiffs' contention that the IMFA, by regulating the conduct of daycares, infringes their fundamental right to direct the care, custody, and upbringing of their children.[3]

As the AG explains, the cases Parent Plaintiffs rely on involving the right to choose a school or educational program are distinguishable because there is no similar requirement compelling daycare attendance (Dkt. 16-1 at 15 n.9; Dkt. 23 at 7). Idaho law defines daycare as

---

[3] Parent Plaintiffs also assert in their briefing, for the first time, an additional, "narrower right to educate and socialize their children in a private forum of their choosing," referring to it as the *Meyer–Pierce* right (Dkt. 20 at 22). While the complaint references parents' rights to direct their children's "upbringing, socialization, and education" in the introduction section (*id.* at 2), no distinct right to socialization is asserted elsewhere. In any event, even assuming the Court considers this newly asserted right, *Meyer*, *Pierce*, and *Farrington* do not establish it as a fundamental right in the context of private daycare. Those cases recognized parental rights concerning the education of children in both private and public *schools*—they did not address a parent's right to select a private daycare based on the daycare's practices.

"care and supervision provided for compensation during part of a twenty-four (24) hour day, for a child or children . . . in a place other than the child's or children's own home." § 39-1102(3). Thus, unlike the educational institutions at issue in *Meyer* and *Farrington*, daycare in Idaho is a private, voluntary service that provides care and supervision while the child is away from home—not an institution through which parents fulfill a legally imposed duty to educate their children.

Furthermore, although Parent Plaintiffs allege that the IMFA interferes with parents' fundamental right to "answer their high duty to seek and follow medical advice on their children's behalf" (Dkt. 1 ¶ 122), they do not explain how the IMFA prevents them from making decisions about whether to vaccinate their children or from seeking medical advice on their behalf. Nor does the IMFA dictate how Parent Plaintiffs must raise, educate, or care for their children. As the AG explains, the IMFA "says nothing about" the parents' decision to vaccinate their children—it simply prohibits a daycare from conditioning its services on that choice" (Dkt. 16-1 at 14).

The IMFA therefore does not restrict Parent Plaintiffs' recognized right to make decisions concerning the care, custody, or upbringing of their children; it regulates the independent conduct of the private daycare they voluntarily choose to use.

**iii. Rational Basis**

Having concluded that the IMFA does not burden a fundamental right, the Court applies rational-basis review. *See Fields*, 427 F.3d at 1208 (holding "government actions that do not affect fundamental rights . . . will be upheld if [] they are rationally related to a legitimate state interest"). Parent Plaintiffs offer no argument that the IMFA fails rational-basis review. As discussed above, the IMFA's prohibition on mandatory medical interventions is rationally related to the legitimate governmental interests of protecting individual autonomy and preventing discrimination based on medical decisions. Therefore, the Court dismisses Count Four for failure to state a claim as a matter of law.

### C. Count Three: Le Soleil's Vagueness Claim

Count Three alleges that the terms "medical intervention," "medical action," and "alter the health or biological function of a person" are vague and confusing in that they provide no guidance as to what is covered or required under the IMFA (Dkt. 1 ¶ 112).

A "basic principle of due process [is] that an enactment is void for vagueness if its prohibitions are not clearly defined." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013). A statute can be void for vagueness for two independent reasons. First, it is void if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (quoting *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009)). Second, it is void "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Here, Le Soleil contends that the IMFA is impermissibly vague under the fair notice scenario (Dkt. 1 ¶ 114).

Consistent with that recognition, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). A statute is unconstitutionally vague if it "specifie[s]" "no standard of conduct at all." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).

In determining the scope of the IMFA, the Court "interpret[s] the law as would the Idaho Supreme Court." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004). Under Idaho law, "[s]tatutory interpretation begins with 'the literal words of the statute, and this language should be given its plain, obvious, and rational meaning.'" *State v. McKean*, 356 P.3d 368, 372 (Idaho 2015) (quoting *Seward v. Pac. Hide & Fur Depot*, 65 P.3d 531, 533 (Idaho 2003)). "When the language of the statute is unambiguous, the [Idaho Supreme] Court will give the

language its plain meaning and refrain from applying statutory rules of construction." *Purco Fleet Servs., Inc. v. Idaho State Dep't of Fin.*, 90 P.3d 346, 349 (Idaho 2004). A statute is ambiguous when reasonable minds might disagree as to its meaning. *McKean*, 356 P.3d at 373. But the mere existence of competing interpretations does not make a statute ambiguous; otherwise, "all statutes that are the subject of litigation could be considered ambiguous." *Farmers Nat'l Bank v. Green River Dairy, L.L.C.*, 318 P.3d 622, 625 (Idaho 2014) (quoting *BHA Invs., Inc. v. City of Boise*, 63 P.3d 482, 484 (Idaho 2003)). Nor is a statute ambiguous merely because an astute mind can devise more than one interpretation. *Id.*

The IMFA provides, in relevant part, that "A school operating in the state or a business subject to [Idaho Code § 39-11] operating in the state shall not mandate a *medical intervention* for any person to attend, enter campus or buildings, or be employed." § 73-503(4) (emphasis added). The IMFA defines medical intervention as "a medical procedure, treatment, device, drug, injection, medication, or *medical action* taken to diagnose, prevent, or cure a disease *or alter the health or biological function of a person*." § 73-502(3) (emphasis added).[4] Le Soleil first argues that the term "medical intervention" is so "vague and confusing" that it provides no guidance as to whether ordinary health and safety practices constitute prohibited medical interventions (Dkt. 20 at 30). For example, Le Soleil contends that because handwashing is recommended by doctors as a disease-prevention measure, it qualifies as a medical action prohibited by the IMFA (*id.*).

The AG responds that the word "medical" modifies each of the terms Le Soleil identifies as vague and therefore limits the scope of the statute to interventions and actions "relating to, or

---

4 Interestingly, Le Soleil acknowledges this statutory definition while simultaneously arguing that the term "medical intervention" is "nowhere defined" and thus allows the State "to rely on their own interpretations" (Dkt. 20 at 29, 31).

concerned with physicians or the practice of medicine" (Dkt. 16-1 at 12) (quoting Medical, *Merriam-Webster Online Dictionary*, https://www.merriamwebster.com/dictionary/medical (last visited Jan. 20, 2026)). Thus, the AG argues, handwashing does not constitute a medical action simply because a doctor recommends it or because it may help prevent disease; rather, handwashing is a matter of basic hygiene, not the practice of medicine (Dkt. 23 at 6).

The Court agrees. Terms in a statute are given their common, everyday meanings when the legislature has not provided a definition in the statute. *Ada Cnty. Assessor v. Roman Catholic Diocese*, 849 P.2d 98, 101 (Idaho 1993). Here, the plain language of the statute limits the scope of prohibited conduct to any "action taken to diagnose, prevent, or cure a disease or alter the health or biological function of a person" that is medical in nature. § 73-502(3). Le Soleil's interpretation would effectively read the word "medical" out of the statutory definition and would sweep ordinary health and safety practices within the IMFA's prohibition merely because those practices may promote health or prevent disease.

Nor does Le Soleil's handwashing example demonstrate that the IMFA fails to provide fair notice of what conduct is prohibited.[5] The mere possibility that a party can devise a strained interpretation of statutory language does not render the statute unconstitutionally vague. *See Farmers Nat'l Bank*, 318 P.3d at 625. The Court finds that the IMFA's use of the word "medical," together with the surrounding terms in the definition of "medical intervention," provides sufficient guidance as to the types of actions subject to the statute. Basic hygiene practices such as handwashing do not become "medical actions" merely because they may prevent disease.

---

[5] To the extent that Le Soleil argues in its response that the IMFA is vague because it invites arbitrary enforcement (Dkt. 20 at 30–31), that argument is waived because it was not pled in the complaint.

The IMFA plainly and unambiguously sets out a standard of prohibited conduct that gives a person of ordinary intelligence fair notice of what is prohibited. The IMFA therefore provides daycares with fair notice of the conduct prohibited by the challenged provisions. Accordingly, Le Soleil has not shown that the IMFA is unconstitutionally vague.

**D. Count Seven: Freedom of Expressive Association**

In Count Seven, Plaintiffs allege that the IMFA violates their First Amendment right to expressive association by preventing Le Soleil from requiring age-appropriate vaccinations and implementing illness policies, thereby interfering with Le Soleil's ability to maintain a childcare environment centered on public health and with Parent Plaintiffs' ability to associate with Le Soleil based on those shared beliefs (Dkt. 1 ¶¶ 152–55).

**1. Fundamental Right**

The Constitution protects the freedom of association as "a fundamental element of personal liberty" and "an indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). That right protects both "intimate association," that is, the "choices to enter into and maintain certain intimate human relationships," and "expressive association," which is "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 617–18. Plaintiffs contend their expressive association rights are implicated here.

Freedom of association is a derivative of the freedoms of speech, assembly, and petition. *Healy v. James*, 408 U.S. 169, 181 (1972). Freedom of association is the "right to choose one's associates," *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987), and it serves to protect other individual liberties guaranteed by the First Amendment, namely freedom of "speech, assembly, [and] petition for the redress of grievances," *U.S. Jaycees*, 468 U.S. at 618. To

this extent, the scope of protections afforded to expressive association covers only those activities involving expression on political, cultural, and social affairs. *Id.* at 626.

But the First Amendment does not extend its protection to "every association that touches these topics." *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1194 (9th Cir. 1988). First Amendment protections can be invoked "only by those groups actually engaged in expressive association." *Sullivan v. Univ. of Wash.*, 60 F.4th 574, 579 (9th Cir. 2023). Accordingly, the Court must first determine whether Le Soleil and Parent Plaintiffs engage in expressive association.

In *Boy Scouts of America v. Dale*, the Supreme Court held that the Boy Scouts is an expressive association because the group disseminates certain moral and ethical values. 530 U.S. 640, 649–50 (2000). Other examples include civil-rights organizations, *Nat'l Ass'n for Advancement of Colored People v. Alabama*, 357 U.S. 449, 462 (1958); political parties and organizations, *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973); labor unions, *Bhd. of R.R. Trainmen v. Virgina ex rel. Va. State Bar*, 377 U.S. 1, 8 (1964); and nonprofit organizations, *U.S. Jaycees*, 468 U.S. at 612. The common thread between these groups is that members "have associated to advance shared views," or engaged in "collective effort on behalf of shared goals," that would be protected by the First Amendment if pursued individually. *Sullivan*, 60 F.4th at 580 (quoting *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1184 (9th Cir. 2017)).

By contrast, "strangers who are merely 'patrons of the same business establishment' and have not joined together to express shared beliefs do not engage in expressive association." *Sullivan*, 60 F.4th at 580 (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 24–25 (1989)). In *Stanglin*, the Supreme Court held that patrons who came together for recreational dancing were not engaged in expressive association. 490 U.S. at 24–25. The Ninth Circuit has likewise held that

the commercial relationship between an escort service, its employees, and its clients does not constitute expressive association. *IDK, Inc.*, 836 F.2d at 1195.

More recently, the Ninth Circuit rejected an expressive-association claim brought by a commercial spa and its patrons, explaining that the spa's provision of commercial services did not constitute expressive activity. *Olympus Spa v. Armstrong*, 169 F.4th 817 (9th Cir. 2026). There, the spa challenged a state anti-discrimination statute that prohibited the spa's entrance policy of "biological women only." *Id.* at 826. The spa claimed to have an expressive association with its members, despite its commercial nature, based on its mission "to restore and rejuvenate women's physical health as well as spiritual health." *Id.* at 836. The Ninth Circuit held that, although a spa's mission statement and services may embody certain ideals, that alone does not make the relationship between the spa and its patrons expressive because treating "the act of visiting a spa into the sharing of 'ideals and beliefs' within an expressive association would stretch the freedom of association beyond all existing bounds." *Id.* The court analogized the spa to the dance hall in *Stanglin*, noting that "patrons of the spa 'are not members of any organized association' to begin with; 'they are patrons of the same business establishment.'" *Id.* The court then contrasted the spa with *Dale*, where the Boy Scouts engaged in expressive activity because it sought to "transmit . . . a system of values" through its activities and stable membership. *Olympus Spa*, 169 F.4th at 836 (quoting *Dale*, 530 U.S. at 650).

Here, Le Soleil claims that although it is a commercial business requiring payment for membership, it is still entitled to First Amendment protection because its chosen message—"that public health is of the utmost importance, and that children should be instructed in accordance with the message"—and its health policies are integral to the daycare and its "instruction of the young" (Dkt. 20 at 33, 35). The Court does not doubt the sincerity of the professed beliefs. But

like the spa in *Olympus Spa*, Le Soleil's mission statement and particular ideals are insufficient to transform the relationship between a commercial daycare and its patrons into an expressive association. Le Soleil provides childcare services to parents who pay for those services. The complaint does not allege that Le Soleil and Parent Plaintiffs have joined together for the purpose of expressing a shared message, as opposed to choosing to do business with one another because they share certain views concerning public health. The fact that Le Soleil and Parent Plaintiffs may share beliefs about vaccination and public health does not, without more, convert their commercial relationship into expressive association. *Olympus Spa*, 169 F.4th at 836.

Even if Plaintiffs' First Amendment rights were implicated, the Court is not convinced that the IMFA interferes with Le Soleil's "instruction of the young." State actions burden the freedom of expressive association through intruding "into the internal structure or affairs of an association" by "[f]orcing a group to accept certain members," which "may impair the ability of the group to express those views, and only those views, that it intends to express." *Dale*, 530 U.S. at 648 (quoting *U.S. Jaycees*, 468 U.S. at 623). The Court agrees with the AG that Le Soleil is free to promote its beliefs and values about public health and vaccinations (Dkt. 23 at 13). The only thing the IMFA prevents is Le Soleil requiring that only vaccinated students hear those values.

Therefore, Le Soleil is not an expressive association because neither it nor its patrons engage in expressive activity.

**2. Rational Basis**

Because the Court concludes that the IMFA does not implicate a fundamental right, the Court now examines whether it is "rationally related to a legitimate state interest." As the Court explained above, the IMFA is rationally related to the State's legitimate interest in reducing barriers to childcare by allowing parents to choose among available daycare providers without regard to their individual medical decisions. Further, the IMFA's prohibitions on medical

interventions as a condition of daycare attendance directly advances that objective. Plaintiffs identify no basis for concluding that the same provisions become irrational when considered in the context of their alleged freedom of association. Accordingly, Plaintiffs' freedom-of-association claim fails as a matter of law.

**E. Count Eight: Declaratory Relief**

Because the Court dismisses Counts One through Seven, Plaintiffs' claim for declaratory relief (Count Eight) likewise fails. *Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 861 (N.D. Cal. 2023) ("Declaratory relief is not a standalone claim.").

This dismissal applies to all Defendants regardless of whether they have moved under Rule 12(b)(6). With respect to Plaintiffs' federal claims, Defendants are similarly situated. A court "may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants." *Silverton v. Dep't of Treasury of U.S.*, 644 F.2d 1341, 1345 (1981); *see also Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) ("A trial court may dismiss a claim sua sponte under [Rule] 12(b)(6). Such a dismissal may be made without notice where the claimant cannot possibly win relief.").

## IV. ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) is **DENIED** as moot.

2. Defendant Attorney General Raúl R. Labrador's Motion to Dismiss (Dkt. 16) is **GRANTED**.

3. Plaintiffs' federal claims (Counts One, Three, Four, Seven, and the federal-law component of Count Eight) are **DISMISSED WITH PREJUDICE**.

4. Plaintiffs' state claims (Counts Two, Five, Six, and the state-law component of Count Eight) are **DISMISSED WITHOUT PREJUDICE**. This dismissal applies to **ALL DEFENDANTS**.

DATED: September 22, 2026

Amanda K. Brailsford
U.S. District Court Judge